## J. O. PRUITT v. STATE.

No. A.-6377.   Opinion Filed Feb. 23, 1929.
Rehearing Denied Oct. 19, 1929.
(280 Pac. 1105.)

Newton & Pinson, for plaintiff in error.

Edwin Dabney, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

DAVENPORT, J.   The plaintiff in error, hereinafter called the defendant, was convicted in the district court of Wagoner county, of manslaughter, and sentenced to confinement in the penitentiary for 14 years. Motion

for new trial was filed, considered, and overruled, and defendant duly excepted, and has appealed to this court.

The defendant demurred to the information on the ground that it did not state facts sufficient to charge an offense. The information states sufficient facts to advise the defendant of the charge against him, and the demurrer was properly overruled.

The testimony on behalf of the state is, in substance, as follows: Pete Pruitt, a son of the deceased, testified he was 11 years old; he was at home the night of the alleged trouble between his father and mother; his mother was Lena Pruitt; his father had been to Coweta the day before the trouble occurred at night; when he returned from Coweta, Jim Thomas aand Mr. Harris returned with him; they were colored men; that, after Thomas and Harris left, his father came in the house, and his mother told him he had better let the old horse stay out there and eat grass; he was intending to go to a picnic at the church-house;

"My mother asked my father about a hat or something, and he got mad, and they went to fighting, and he whipped and beat her, and tried to make her take it back; he got up and got the gun and hit her in the side and broke her down, and tried to make her take it back, what she said about the hat; he had bought a hat, and my mother asked how come he did not bring some milk for the baby, and he got mad. The hat was for Georgia Bland, a negro woman who lives in the community; he got the gun from the side of the wall, it was a Winchester rifle; before he got the gun he had hit her with his fists; when she fell to the floor, he began kicking her in the breast; I do not know how many times he kicked her; she got up and got to the bed some way; wanted some water to wash her face, and I got her a pan of water; her eyes were blooded, and blood about her face; there was blood on the side

of her head; father then made me go back to bed; there are two rooms in the house. My mother was not up any time Monday that I know of; there was no washing done at our house on Thursday after my father had the trouble with my mother on Saturday; my mother was taken to Coweta about Friday after the trouble, in a wagon; she never got up any more after she came home from Coweta on Friday."

The witness was asked in regard to many things not material to this case.

On cross-examination, witness stated his father hit his mother with a gun; that he saw the gun in his father's hands;

"He hit her on the side with the gun once; I saw him hit her five or six times with his fist, on the head and neck; I was not scared to bring the water; my father told me to bring the water; this was on Saturday night; my mother did not do anything the next morning, she did not let Mr. Flynn and grandfather in the next morning, the door was already open; my mother went to town Friday with my father and the baby, he took mother to a Doctor; I do not know when Dr. Riddle first came out to the house; my mother stayed in bed all the time after he first came out to the house until her death; I think Dr. Carter came out either Saturday or Sunday before mother died."

Lee Trunnell was called, and testified she was living in Coweta in 1925, and remembers the case of Lena Pruitt being confined to her home about the 11th day of July, 1925, or some days afterwards; Lena Pruitt was beat up on the 11th of July; witness stated she was at her home the 13th, which was on Monday; Lena Pruitt was her niece;

"She was in bed, there was a big lump of blood in her eye, a gash on the side of her head, and there was prints on her neck, seems like she had been choked; I was at her home about three hours."

Several other witnesses were called by the state who testified as to the injuries on the body of Lena Pruitt, in substance, as did Lee Trunnell.

Dr. A. E. Carter, called on behalf of the state, in substance, stated his home was at Haskell, Okla.; that his name was A. E. Carter; prior to coming to Haskell he lived at Coweta; had been a practicing physician for 21 years; had practiced at Coweta about 18 or 19 years; he knew Lena Pruitt in her lifetime; he had visited her in a professional way; that he visited her just before she died; that it was on Saturday, about the 21st or 22d of July, and she died the Monday following the Saturday he visited her; when he first went to see her she had what you call bloodshot eyes, inflammation of the eyes, and a dark discoloration around the eyes; she was in a semiconscious condition; she seemed to be somewhat restless, and had very high temperature;

"After noticing this discoloration around her eyes, I tried to talk with her and could not get any information; there was two other ladies there; and as I could not get any information, I had the ladies move her to one side of the bed, in order to make a better examination, and I noticed her abdomen was distended, very tender, and then on the left side there seemed to be some rigidity there—a hardness to one side—she was semiconscious and in great pain, and in such condition that I could hardly examine her as I wanted to on my first visit; her fever was very high, and I was afraid it would go higher and she would have a shock, and I decided I would not do anything more, and left instructions to be carried out I said I would come back Sunday; I returned Sunday, and found her condition worse; I figured the rigidity on the left side must have been caused from an injury of some nature, judging from the condition of the discoloration, I figured there must have been some injury some way. I could not get any information at all; there are many ways whereby it

might have happened; I could not say just what it was; it is possible the injury could have been inflicted by a heavy boot, or from a fall of some character."

On cross-examination, Dr. Carter stated that the deceased was restless and had high temperature; that as a rule it was usually the condition of one nearing death, but not always; there are other causes of that condition;

"If my memory serves me right the injury was on the left side; the rigid condition may follow malarial or typhoid fever, but not of this nature or extent as I found on the deceased; I did not observe any bruises on her body that were in view except around her eyes I mentioned. I don't remember stating in the death certificate her death was caused by concussion of the brain from a blow on the head and internal injuries."

The above statement is, in substance, the testimony on behalf of the state.

The defendant called George Bland, who testified, in substance, he lived about a quarter of a mile from J. O. Pruitt; that he heard of the trouble between Pruitt and his wife on Saturday night; he went up to the Pruitt home on Sunday morning and when he first went up to the home he did not see Lena Pruitt but about two hours afterwards he saw her sitting on the bed;

"I just saw her through the window and asked her where Doc was; she said James and Andrew are up there, and I turned around the house and went on up the road; I next saw her the first of the week, she brought the children some water out where they were working in the field; I went home, and the next coming Thursday I saw her at the washing tub and wash water, she had the wash tub out of doors; I don't know whether she was doing the family washing, but she was washing over a tub; I know she went to Coweta on Friday; I know Dr. Riddle, I was at their home when Dr. Riddle first came I never talked to

the deceased about this difficulty; Georgia Bland is my daughter; I heard his wife accuse Doc of buying a hat for Georgia, but they never had no racket."

Andrew Flynn called as a witness, testified he was at defendant's home on Sunday morning after the row on Saturday night:

"I saw the deceased on Sunday morning, she was not in bed when I seen her the last time; she was up and around Sunday morning after the difficulty; I did not pay any attention to the bruises at all; I did not see Georgia Bland at the home of defendant that morning."

W. M. Marsh testified he saw the deceased in Coweta, she did not appear to be sick;

"I don't know what she was doing there; I saw her going across the street and met her; I saw her sitting in a wagon, and saw Pruitt put groceries in the wagon, in front of Ira Nichols."

Tobe Pruitt, called on behalf of the defendant, stated he was the father of defendant and lived about a mile from the defendant at the time of the trouble;

"I went up to the house the next morning, and Lena was standing up there, and I asked her what was the matter, and she said nothing, and I knowed she was not going to tell me no more, and I never said nothing more to her; I just turned around to Doc, and asked him to figure up what Andrew owed me; I saw her on Friday following, when she went to town; I did not see her any more after Friday until after she was dead."

On cross-examination, witness stated he and Andrew Flynn were up to defendant's home after the trouble on Saturday night; that he did not see Georgia Bland when he was up there on Sunday morning.

Defendant J. O. Pruitt, called as a witness in his own behalf, testified he had lived in and around Coweta for 16

years; that he had several children; his wife was named Lena; they had been married 12 or 13 years; their son Pete Pruitt was about 11 years old; that he was in Coweta Saturday, July 11th, 1925, he went to Coweta to buy groceries for a picnic they were going to have; that when he came home another man and Mr. Harris drove up in the yard;

"I got off the horse at the door and met my wife, and she asked me if I brought the milk for the baby, and I said I did, and seemed like she was mad, and she said, 'No, you didn't,' and I said, 'Yes, I did,' and went up to the dresser and laid it down and walked out in the yard, and she kept mumbling and going on, and so they left; this was about dark; I went out to the lot and tried to catch the horse, and he run and I went back to the house, and she still kept fussing and quarreling, and I went out and set down on the wood pile for a while and went back to go to bed, and started to pull off my clothes; she started about the milk again, and was not satisfied; I sat down on the cot, and she gets up and goes toward the dresser and started toward me and I told her not to come toward me; she went to where the razor was, and we tussled around there, and I slapped her face and kindly got her loose. About two years before she attacked me with a hatchet. She came down to where I was with her hand under her apron, and I walked up and pulled her apron loose and got the hatchet and carried it and gave it to my father; she was about 28 or 29 years of age; I am 36; after I knocked her loose I layed down, and she did not bother me; I took the razor away from her; I did not kick her in the side; I did not beat her up with the Winchester, as stated by my son Pete; the Winchester was a big old-fashioned rifle, and belonged to my father-in-law; from the looks of it I suppose it weighed about 10 or 15 pounds; I was afraid she was going to use the razor if she got a chance; my children were in the other room; it was a custom to have the door closed between the children's room and my wife's room after we had gone to bed; the door was closed that night; if Pete was up any time that

night I did not know it; he did not come into the room where me and my wife was; nobody brought any water in for my wife to wash her face; it was not very long after this trouble until I went to bed; my wife got up the next morning before I did, she prepared breakfast as she always did; after I had my breakfast I went to Mr. Thomas'; when I got back home my wife was out of bed as far as I knows; we were still doing some work in the field; my wife cooked the meals I suppose as usual the following Monday; the next day I noticed she was kindly purple around her eyes, and looked like scratches around the eyes; but not like any great big wounds, just scratches; I did not kick her in the side or in the breast, or hit her anywhere other than what I might have done on her face nor did I hit her with any hard substance of any kind; up until Thursday she was up and around doing the ordinary house duties; she went out and carried the children some water in the field where they were chopping cotton; she did a washing Thursday, and Friday she went to town; when we got back home I wanted to take the things we had bought up to the picnic ground; where she got out of the wagon was about a quarter of a mile from our house. On Sunday morning following she complained of having a chill like, this was a week and a day after the trouble, I goes to town to see Dr. Riddle, and get some medicine and brought it back for her; Dr. Riddle has been our family doctor for some time, ever since Dr. Carter left from here. I do not recall, but either Monday of Tuesday, she did not seem to be doing any better, and I called Doctor out there; Dr. did not make any examination, but prescribed for her; he came back in about a day and examined her and gave her some medicine; come again about the last of the week; she did not seem to improve any; I then went over to town and asked about Dr. Carter, and Mrs. Nichols said he had been in Oklahoma City, but he had returned, and I told her to send for Dr. Carter, and left a message for her to send and went home; Dr. Carter lived at Haskell at the time; Dr. Carter came out; he said her fever was so high he could not make a thorough examination, and said, 'If she is better in the morning I will see if I can abate her

fever; if I examine her now I believe it would cause her fever to go higher, maybe I can make an examination in the morning'; he said he could not really tell what was the matter with her; he came back Sunday morning; I don't think he gave her but one dose of medicine; he said if he could not abate the fever it would not be any use to make the examination as high as her fever was; she died Monday the 27th day of July, 1925; I did all I could to get medical assistance for her when she needed it; I was there while she was sick, doing all I could for her; when Dr. Carter came she did not seem to be in her right mind; I did all I could to assist in caring for her until they put me in jail; they would not allow me to assist in handling her, but I went to town and got the casket. Before she died she complained of her chest hurting (indicating chest), and she said she had a hurting in her stomach. I was not trying to kill my wife the night the trouble occurred, I was just trying to keep her from hurting me; I had no intention of hurting her seriously."

On cross-examination defendant stated his wife was about his weight and size; he did everything he could that was necessary to keep her from getting to him with the razor—

"A lick with a gun would have been a pretty severe blow hit by a man of my size. After I got the razor I put it back where it was; I guess she saw me, and we talked it over, and she was all right. I slept on the cot in the same room with my wife."

The cross-examination went into the question of the defendant trying to get his son Pete away from the parties between the death of his wife and the time of the trial.

On redirect examination witness stated when his wife died there was a large crowd of people around; that Pete was his boy, and he thought it proper to have him at home with him—

"I did not object to the women laying my wife out and dressing her. On re-cross-examination he said he did not know what they thought about the illness of my wife or as to there being anything wrong with her death."

Dr. A. E. Carter recalled for further examination stated he did not state in the death certificate the words, "internal injury."

The undertaker, Harry Trower, who prepared the body for burial, stated as well as he could remember there was a bruise on the face, but he did not pay much attention to it; it is common for blood clots to form on the side of a person after death, which are called post mortem stains, a kind of settling of blood.

Dr. H. K. Riddle called, stated he was a legally practicing physician, and had been since 1913; that he knew J. O. Pruitt; had known him for 5 or 6 years; had practiced some in his family and was called to attend his wife on July 20th, 1925; he had prescribed for her prior to that time; it was on Sunday he first prescribed—

"J. O. Pruitt, the husband of the woman came to see me, and I gave him a prescription for the illness he described it, not having seen his wife; I was called out to the J. O. Pruitt home July 20th, that was the Sunday following."

Dr. Riddle was asked in what condition he found her, and stated she had quite a high fever, and was rather restless, tongue coated, and had vomiting spells, epigastric pains, and gave the history of having had a chill the day before; her temperature would subside and then would come up again—

"I made an examination, she had a black eye, and little scratched places on her head; that was all the bruises I saw on her; her eyes were a little red; she had been

poked or hit in the eye; she could see all right. I did not notice any scratches or marks on her throat; if there had been any they had disappeared when I saw her. Remitting bilious fever is a malarial fever that starts with a chill, but the fever never subsides, it goes down lower and then comes right back. A fellow with intermittent fever will have a chill, and his fever will die down altogether, and maybe come back again, and he will have another chill, but remitting fever never subsides entirely. Remitting fever is what we call continuous fever. I next called on Lena Pruitt the 22d day of July, in the morning, about 10 o'clock; she was in about the same condition excepting she had considerable temperature, with some constriction in the lower part of the right lung; I renewed my prescription, she was worse than she was on the 20th; I saw her again about midnight of the 22d, or early morning of the 23d; she had quite a little constriction of the lower lobe of the right lung, and her temperature was higher, and she was partially delirious at times; that was the last time I saw her, I understand she died on the 27th day of July; I am positive it was her right lung she complained of; I did not observe any bruises or abrasions or cuts on the body; I used a stethoscope in making the examination, and I discovered her lungs were affected."

On cross-examination the witness stated that remitting fever was not considered fatal—

"There are some cases which are; the congestion in one of the lungs might have been caused by a kick or blow with a shoe, with the other trouble following it, but it looks like there would have been some external evidence if the person had been kicked hard enough to have caused that."

This, in substance, is all the testimony, excepting some character witnesses that were called who testified as to the previous good character of the defendant. The state called some rebuttal witnesses, but the testimony brought out by them does not materially change the facts

in this case. The testimony is conflicting, and, if the testimony of the state is true, the deceased, Lena Pruitt, never regained her physical condition after the fight she and her husband engaged in. The 11 year old boy of the parties testified that defendant struck the deceased in the side with a Winchester with sufficient force to break her down—being the expression of the witness. The defendant says he slapped the deceased sufficiently hard to get her loose from him and to get a razor away from her. There is no dispute in the record as to the fact that defendant and deceased had a row about a hat, it is claimed the defendant bought for Georgia Bland, a negro woman who lived near them, and that defendant struck the deceased with sufficient force to knock her loose from defendant. The defendant denies that he beat up the deceased, or that he struck her with the Winchester gun, as testified to by his 11 year old son. The deceased went to Coweta with the defendant on a shopping errand, and returned home, and the following Sunday defendant went to see Dr. Riddle and got some medicine for the deceased.

The testimony of Dr. Riddle, who was called as a witness by the defendant, shows that his examination disclosed that the deceased had a chill and that her temperature was very high, and that he had visited her on three occasions and found her with a congested lung; that later, a few days before her death, Dr. Carter, a negro doctor, was called in to see the deceased, and Dr. Riddle did not go back to see her any more. The testimony, on behalf of the state, brought out by Dr. Carter was to the effect that deceased showed bruises on her head and face, and that her eye was black, and that, when he called to see the deceased, he could not make a thorough examination, but that she had a protruded abdomen and seemed to be suffering from some internal injury. Dr. Carter gave as

his opinion that the injury was caused by some blow received on the side by some kind of a weapon, the character of which he could not state.

The defendant denied striking the deceased with the Winchester but admitted he had the Winchester at the house.

Six separate errors have been assigned by the defendant, the first being that the court erred in overruling plaintiff in error's motion for a new trial; the third, that the verdict of the jury is contrary to the evidence; and, fourth, that the verdict of the jury is contrary to both the law and the evidence. These three assignments may be properly considered together, as they relate to the only question argued and discussed by the defendant that the verdict in this case is contrary to the law and the evidence. Defendant in his brief says:

"We further state that the real competent evidence does not support the verdict, and that the same should be vacated, and the case remanded for a new trial."

We cannot agree with the contention of the defendant. An examination of the record shows that the testimony is conflicting. It is only necessary to reiterate that this court has repeatedly held that the trial jury is the exclusive judge of the weight of the evidence, and that of the credibility of the witnesses, and that this court will not reverse a judgment of conviction, where there is competent evidence tending to support the same. Williams v. State, 17 Okla. Cr. 639, 191 Pac. 744.

The evidence in this case, on the part of the state, and that of the defendant, is in direct conflict as to what occurred at the time defendant and deceased had their fight at their home, and also the evidence of the doctors as to

40

the condition of the deceased prior to her death, and as to the cause of her death. The jury in this case settled the conflict of the testimony against the defendant, and this court will not disturb the verdict of the jury. After a full consideration of all points urged by counsel for defendant for a reversal of the judgment, we conclude that none of the errors complained of were such as to deprive the accused of that fair and impartial trial which is accorded under the Constitution and laws of this state.

The judgment is affirmed.

EDWARDS, P. J., and CHAPPELL, J., concur.